PATTEN et al. v. GLATZ et al.

(Circuit Court, E. D. New York. May 24, 1898.)

FALSE REPRESENTATIONS — SUFFICIENCY TO WARRANT SETTING ASIDE CONTRACT.

> Representations which consist partly of exaggerated expressions as to the importance and value of defendant's property, which he evidently believed to be true, partly of statements as to specific facts which were true at the time they were made, but not when the contract was entered into, and statements as to other specific facts not demonstrated by the evidence to be false, are not sufficient to warrant setting aside, as fraudulent, a written contract procured thereby.

Final hearing upon pleadings and proofs of a bill in equity to set aside a written contract between Patten and Glatz, who will be hereinafter referred to as "plaintiff" and "defendant," respectively, the other plaintiff and the other defendant being substantially nominal parties only.

John Patten, per se.
Briesen & Knauth, for defendants.

LACOMBE, Circuit Judge. It was stated upon the argument that the record was not printed because both sides were financially embarrassed and unable to pay the expense. Assuming that they should be saved all avoidable expense, it has been most unfortunate for both sides that, in taking the testimony, such extravagant and unnecessary prolixity has been indulged in. The court, upon a demurrer, most clearly indicated that the only issue cognizable in equity was whether the written contract had been obtained by false and fraudulent representations, and should for that reason be set aside. If plaintiff failed to sustain the affirmative of that issue, the bill should be dismissed. Whatever he might be entitled to recover under the agreement could be equally well recovered in an action at law. If, on the contrary, plaintiff maintained the affirmative of such issue, the court would, no doubt, direct an accounting; but, until such issue was maintained, it would be a waste of time

and money to take any evidence bearing upon such accounting. The record here presented, however, is stuffed full of irrelevant matter, contains page after page of testimony concerned with transactions long subsequent to the making of the written contract, and is at least 10 times as voluminous as it should have been.

The written contract which it is sought to set aside was entered into February 20, 1890. It recited that Patten had invented certain improvements in apparatus for concentrating soap lye in the manufacture of crude glycerine, described in an application for letters patent then in course of preparation; that, by other instruments of even date, the exclusive right to use said improvements was granted to Glatz; and that Glatz was in receipt of certain royalties from certain soap manufacturers, to whom he had theretofore granted licenses under certain patents owned or controlled by him, covering certain processes of recovering glycerine from soap lye. By the terms of the contract, Glatz, in consideration of said exclusive right to use Patten's said improvements, agreed to "use his best endeavors to persuade other soap manufacturers to also take licenses for the use of said processes (i. e. Glatz's processes), and for the use of said Patten's improvements." He further agreed to keep books of account, and to enter therein "all the gross royalties received from any and all patents and improvements which he may license others to use for the concentration of soap lye in the manufacture of crude glycerine." This language covers licenses under any patent or improvement separately, or under any two or more conjointly, on one or more of Patten's improvements, or on one or more of the "certain patents owned or controlled by" Glatz. He further agreed to pay to Patten 5 per cent. the first year, and $7\frac{1}{2}$ per cent. thereafter, of "all the gross royalties and moneys enumerated" in the statements which he bound himself to make periodically to Patten. Patten and Glatz had been working together in this business since 1888, apparently without making much of a success of it. On January 10, 1889, they entered into a written contract, which recited that Patten "claims to have invented an improved evaporating apparatus and evaporating process for which he intends to apply for letters patent." etc.; that Glatz "is desirous of obtaining the exclusive right and license to use said invention as applied to the evaporation of soap lyes, glycerine, and salt." By this contract, Patten gave to Glatz an exclusive license to make, use, and vend said apparatus and process throughout the term of any letters patent that might be secured therefor, in consideration of a license fee of 50 cents per square foot of heating surface on every apparatus containing said invention. Plaintiff avers that prior to February 20, 1890, this contract of January 10, 1889, had been abrogated by consent of the parties, and a new verbal agreement made, whereby, without being himself required to contribute to any losses, Patten was to have 50 per cent. of any profit which Glatz might make out of any plant embodying either the improvements or the process, all the expenses and losses to be borne by Glatz. The burden of proving such agreement is, of course, upon the plaintiff, and his testimony tends to prove it; but in view of the positive denials of defendant, of the inherent improba-

bilities, and of the failure to produce corroborating testimony by Quimby, who, according to the plaintiff's story, was informed as to the fact, I am not satisfied by any fair preponderance of proof that such verbal contract was entered into. Therefore, until the contract of February 20, 1890, was entered into, the contract of January 10, 1889, was still in force.

Plaintiff asks to have this contract of 1890 vacated and set aside, on the ground that he was induced to enter into it by certain representations of Glatz, which were false and fraudulent, were made by Glatz with the knowledge that they were false, and with the fraudulent intent of inducing Patten to enter into the contract, which representations were material, were believed by Patten, and relied upon by him. The representations alleged in the complaint are:

"That said Glatz owned or controlled a large number of patented inventions of the controlling processes for the concentration of soap lye in the manufacture of crude glycerine, and has licensed a large number of parties who were engaged in the said work, and received from said parties large sums of royalties from said licensees, and was obliged to pay out large sums in royalties for the use of said patented processes."

The testimony of the plaintiff supports the averment that such representations were made. Indeed, although covered by the denials in the answer, defendant did not testify that he did not make such statements; nor, indeed, was he interrogated on the point. The evidence of the plaintiff, however, does not localize these representations relatively to the contract complained of. They seem to have been made at the very outset of the intercourse between the two men, and to a large extent were then true. Certainly, at that time Glatz's rights under the Domeier and Hageman process had not been assigned to W. S. Kirk & Co. Glatz did own patents, and did have licenses to use patents, and had licensed a number of parties, and was obliged to pay out sums in royalties. Whether or not the number of patents and the number of licensees and the sums paid out in royalties were "large" is difficult to determine. What looks large to one man may look small to another. It is quite likely that Glatz represented that "he had the only successful processes for properly treating soap lye," and that he "controlled the process he was using by a large number of patents." But it is equally likely that he believed his own statements (men who hold patents and exclusive licenses are apt to think they control the only method of manufacture); and he certainly acted as if he fully believed he controlled a process destined to be most profitable, at least down to the time when the Buffalo plant failed to work, and plaintiff undertook, as he says, to make it practicable. From that time plaintiff was in as good a position as the defendant to judge of the value of the process they were both experimenting with. The vague and glittering generalities with which business men commend their property are not usually sufficient to warrant the setting aside of written contracts on the ground of fraudulent misrepresentations. They are rather expressions of opinion than statements of fact.

The "representations" upon which plaintiff alleges that he relied are thus stated in his own language:

"He told me that his most valuable patents related to the chemical treatment of the soap lyes to prepare them for concentration; informed me that he had obtained control of a very large number of patents, some of which he had bought, and others he was paying royalty for their use. He said that he had about a dozen very valuable patents, that practically controlled the art of purifying the soap lyes. He represented that in obtaining control of that industry, that he had secured a very large number of patents that might prove of no great value. On two or three occasions he stated that he controlled as high as eighty patents, but he did not claim that more than about a dozen of them were valuable. He informed me that while he was all right with his chemical processes for treating the lyes preparatory for their concentration, that he had had a sad experience with the apparatuses he had used for concentrating them. * * * He told me that he had the only successful processes for properly treating soap lye, and that he controlled the processes he was using by a large number of patents."

Other than as to ownership or control of a large number of patents, there is in this no specific representation of fact—such as an assertion that he was receiving some stated amount of royalties, or that his profits had aggregated some named sum—the truth or falsehood of which must have been known to the defendant. There is little doubt that, when he told Patten that he controlled the only successful process, he believed he did control such a process; and there is as little doubt that he was mistaken in such belief. But he had actually paid out money to obtain several different patents and exclusive licenses; had made contracts with third persons under which he was to receive royalties; and he was no doubt quite as much surprised as was the plaintiff when it turned out that his effort to reap some profit from his patents and exclusive licenses involved him in financial disaster.

The plaintiff further testified (and he was not contradicted) that just prior to the making of the contract of February 20, 1890—

"When the question of what percentage I would get out of the whole thing came up, he represented that on one set of his patents he was paying 30 per cent. of the profits, and that on another set he was paying 15 per cent. He made the remark that if he should pay 45 per cent. on his other patents, and 50 per cent. on mine, he would only have 5 per cent. left. He used this expression, of course, only in a way of illustration. I expressed the opinion that the royalties he was paying were very high. He asked me how much I thought he was entitled to, and in reply I complimented him on the enterprise he had shown in putting up the plants, and told him that I thought he was certainly entitled to at least one-half of all that might be made out of the enterprise. He, in reply to my remark, stated that if he should have half for himself, that that would only leave me 5 per cent. * * *"

There is here a specific statement, but the evidence does not demonstrate its falsity; indeed, the weight of the proof would seem to indicate that, when the expenses and losses were deducted from the gross royalties, half of the residuum would be considerably less than 5 per cent. of such gross royalties.

For these reasons, the court is constrained to decide that plaintiff has failed to show sufficient ground for setting aside the written contract. That being so, the bill must be dismissed, for this is not a partnership, and there is no ground for maintaining the bill solely for an accounting of the royalties under the contract. Plaintiff has his action at law for his 5 per cent. or 7½ per cent. thereof. The bill is dismissed.